## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSEPH W. KAMINSKY, JR.,

     Plaintiff,

     v.

DORA B. SCHRIRO, Commissioner of the
Department of Emergency Services and Public
Protection, et al.,

     Defendants.

No. 3:14-cv-01885 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

Acting on information that Joseph Kaminsky, Jr., was a felon in possession of three machine guns and other firearms, state and local police officers traveled to his home in Coventry, Connecticut, on December 16, 2011.  After hearing a pounding on the side of his house and observing officers in the yard with their hands on their holsters, Kaminsky opened the front door, spoke to one of the local officers whom he knew, and gestured for the officer to come in.   Three officers entered and, ultimately, the police seized a large quantity of guns and ammunition from the home.  Kaminsky now claims that his consent to the entry was coerced, as he feared the police would kick down his front door, and thus that the officers violated his Fourth Amendment rights by entering his property and seizing his weapons without a warrant.  The local police officers have moved for summary judgment, and I must decide principally whether there is evidence in the record that would permit a reasonable juror to find that Kaminsky's consent was coerced.  I find that there is not and grant summary judgment to the local police officers with respect to the entry into the home.  I also grant them summary judgment with respect to the seizure of the firearms and ammunition, as only one of them was involved in that seizure and the evidence shows that Kaminsky voluntarily consented to the seizure.  However, because the parties have not addressed in their briefs whether some of the local officers entered protected

portions of Kaminsky's yard referred to as "curtilage" in Fourth Amendment parlance, and because there is some evidence in the record suggesting they did, I deny summary judgment to the local officers who entered Kaminsky's yard without a warrant.

## I.   Background

### A.  Facts[1]

On December 16, 2011, Connecticut State Police ("CSP") Officer Barbara Mattson received a call from FBI Agent Eric Moore about Kaminsky's recent application to renew his federal firearms permit.  (ECF No. 57-5 at 6.)  Agent Moore informed Mattson that the records check conducted for the renewal revealed that Kaminsky was a convicted felon, and that the conviction was from 1964.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 1-2; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 1-2.)  Agent Moore also informed Mattson that Kaminsky had three registered machine guns.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 3; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 3.)  Conn. Gen. Stat. § 53a-217 prohibits felons from possessing firearms.

Mattson then contacted members of the Coventry Police Department ("CPD") to inform them that Kaminsky was a convicted felon and had machine guns and other firearms in his possession.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 4; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 4.)  In light of this information, CPD personnel –Lt. Solenski, Sgt. Flanagan, and Officers Dexter and Opdenbrouw– accompanied Mattson and Connecticut State Police officers to Kaminsky's home on December 16, 2011.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 5;

---

[1] The facts are taken from the Defendants' Local Rule 56(a)(1) Statement (Def.'s L. R. 56(a)(1) Stmt.) (ECF. No. 57-2) and Kaminsky's Local Rule 56(a)(2) Statement (Pl.'s L.R. 56(a)(2) Stmt.) (ECF No. 65).  The facts are undisputed unless otherwise indicated.

Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 5; Amended Complaint ("Am. Compl."), ECF No. 35 at ¶ 4, 25.)

When they arrived at Kaminsky's home, Lieutenant Solenski of the CPD initially communicated with Kaminsky.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 8; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 8.)   Kaminsky met Solenski and CSP Officers Mattson and Imbibo at his front door.  (ECF No. 57-5 at 6.)  Kaminsky, who knew Solenski and recognized him, asked "What is going on, Walt?" and why the police were there.  (ECF No. 57-10 at 7.) Solenski responded that the State Police wanted "come in and look at your house" because Kaminsky had firearms.  (*Id*.; ECF No. 57-5 at 7.)  Kaminsky opened the door for Solenski to enter and waved him into his home.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 12; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 12.)  Plaintiff does not dispute that he opened the door and waved Solenski in, but says that the action was not voluntary as he felt forced to do so.  (Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 12; ECF No. 65 at 25.)  According to Kaminsky, as the police approached his home, they "pounded on the side of the house like they hit it with a butt of a rifle or with their billy club."  (ECF No. 57-10 at 5.) Kaminsky never told Solenski that he could not enter his home.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 14; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 14.)  Kaminsky does not know if Flanagan ever entered his home, and does not know who Dexter and Opdenbrouw are or what they look like.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 16-18; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 16-18.)  Kaminsky never saw any police officer have a drawn weapon or a long gun.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 6-7; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 6-7.)  While police officers were at different places around the house, Kaminsky also did not see any officers with helmets on, and

does not know if they were wearing bulletproof vests.  (ECF No. 57-10 at 6.)  The officers

around the house had their hands on their pistol holsters.  (*Id.*)

Once inside, Mattson informed Kaminsky that he was a convicted felon; Solenski never

told Kaminsky that he was a convicted felon.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 9-

10; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 9-10.)  No member of the Coventry Police

Department told Kaminsky that he could not have weapons in his possession.  (Def.'s L. R.

56(a)(1) Stmt., ECF No. 57-2 at ¶ 11; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 11.)  Kaminsky

explained to Mattson that his attorney was working on his felony conviction and asked her to call

his attorney.  (ECF No. 57-5 at 6.)  Mattson called his attorney, Donald Weisman, from the

kitchen, and explained that Kaminsky was unable to possess firearms because of his felony

conviction.  (ECF No. 57-5 at 6-7.)  Weisman stated that Kaminsky would cooperate.  (*Id.* at 7.)

After Mattson spoke with his attorney and told Kaminsky that he was a convicted felon

and that it was illegal for him to possess firearms, Kaminsky agreed to turn over his firearms.

(Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 19; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶

19.)  Based on the information that he was a convicted felon, Kaminsky believed that it was

illegal for him to possess the firearms and thus he intended for the officers to remove his

firearms from his home.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 28-29; Pl.'s L. R.

56(a)(2) Stmt., ECF No. 65 at ¶ 28-29.)  Kaminsky now disputes that he was in fact a convicted

felon, contending that the offense for which he was convicted – unemployment fraud – was not a

felony in 1964.  But he does not dispute that he agreed to turn over his firearms.  (*Id.* at ¶ 19.)

The officers confiscated 36 firearms and certain ammunition.  (ECF No. 57-5 at 7.)  Dexter

helped carry the firearms from Kaminsky's home to police vehicles.  (Def.'s L. R. 56(a)(1)

Stmt., ECF No. 57-2 at ¶ 21; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 21.)  Hicks was not at

Kaminsky's home; he processed the firearms in the Coventry Police Department evidence and property room.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 22-23; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 22-23.)

On December 19, 2011, Mattson and CSP Detective Musial returned to Kaminsky's home and he turned over an additional 23 firearms to them.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 24; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 24; Am. Compl., ECF No. 35 at ¶ 38.)  No Coventry Police Officers were present at Kaminsky's home on December 19, 2011. (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 25; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 25.)  Hicks again processed the new firearms in the Coventry Police Department evidence and property room.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 26; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 26.)  Kaminsky also asserts that there are an additional 24 firearms that were confiscated from his property and not recorded anywhere, but acknowledges that no Coventry Police Officers were present when the firearms were taken.  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 27; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 27.)

### B.  Procedural History

Kaminsky filed this lawsuit under 42 U.S.C. § 1983 on December 16, 2014, against the following defendants: Dora B. Schriro, Commissioner of the Connecticut Department of Emergency Services and Public Protection ("DESPP"); DESPP Sergeant Paolo D'Alessandro; Chief of the CPD Mark A. Palmer[2]; CPD Lieutenants Walter Solenski and Brian Flanagan and CPD Officers Michael Hicks, Robert Dexter, and Ted Opdenbrouw; and CSP Officers Barbara Mattson, Vincent Imbimbo, and Sean Musial.  (ECF No. 1.)  He then amended his complaint on

---

[2] The Court granted Defendant Palmer's motion to dismiss on June 16, 2015.  He is no longer a defendant in the case.  (ECF No. 32.)

September 2, 2015. (ECF No. 35.) On June 21, 2016, I granted in part and denied in part Defendants' motion to dismiss the amended complaint. (ECF No. 63.)  I dismissed the claims against the State Defendants in their official capacities, the portion of Count Two asserting a Second Amendment violation, the portion of Count Three asserting a First Amendment violation, and the supervisory claim against Defendant D'Alessandro, and dismissed without prejudice the remaining portions of Counts Two (asserting a violation of Article First, Section 15 of the Connecticut Constitution), and Three (asserting a violation of Article First, Section 10 of the Connecticut Constitution).  I also dismissed the claims against Defendants Solenski and Flanagan in their official capacities.  The sole remaining claim asserts a violation of the Fourth Amendment against Mattson, Musial, and Imbimbo of the CSP (the "State Defendants") and Solenski, Flanagan, Dexter, Opdenbrouw, and Hicks of the CPD (the "Coventry Defendants") in their individual capacities.  Kaminsky alleges that the Solenski, Flanagan, Dexter, Opdenbrouw, and Hicks "unlawfully entered upon the Plaintiff's property without consent and in the absence of a warrant on December 16, 2011."  (ECF No. 35 at ¶ 112, 114, 116.)  He also alleges that Dexter, Opdenbrouw, and Hicks, under the supervision of Solenski, "unlawfully entered the real property of the Plaintiff" and "unlawfully seized 36 firearms and ammunition from the Plaintiff's home in the absence of a warrant and by threat of arrest unless the Plaintiff complied."  (*Id.* at ¶ 113, 115, 117.)

The Coventry Defendants have filed a Motion for Summary Judgment, arguing that they are entitled to qualified immunity because they reasonably relied on information relayed to them by the State Police.  They also argue that there is no evidence that they took initial possession of Kaminsky's firearms.  Opdenbrouw and Flanagan also argue that there is no evidence that they

entered Kaminsky's home, and Hicks argues that there is no evidence that he visited Kaminsky's property at all.

## II.    Legal Standards

### A.  Summary Judgment

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted).

An issue of fact is "material" if "it might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000) (internal citation and quotation marks omitted). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal citation and quotation marks omitted). On summary judgment, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (internal citation and quotation marks omitted).

### B.  Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks and alterations omitted).  "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id*.  "The Second Circuit has consistently held that consent need not be express but may be implied from an individual's words, acts or conduct." *Seifert v. Rivera*, 933 F. Supp. 2d 307, 316 (D. Conn. 2013) (internal quotation marks and citations omitted).  "Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010) (holding that the defendant had consented where he allowed the police officers into his apartment building and allowed the officers to follow him into his apartment "without impediment or objection to the entry of the police.").  "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." *United States v. Garcia*, 56 F.3d 418, 422–23 (2d Cir. 1995).

### III.   Discussion

Kaminsky's Fourth Amendment claim alleges that the Defendants "unlawfully entered upon the Plaintiff's property without consent and in the absence of a warrant on December 16, 2011" and "unlawfully seized 36 firearms and ammunition."  (ECF No. 35 at ¶¶ 109-110.)

### A.  The Entry Into Kaminsky's Home

The Coventry Defendants who entered Kaminsky's home on December 16, 2011, were Solenski and Dexter, and they argue that Kaminsky consented to the entry and thus they did not violate his Fourth Amendment rights.  Kaminsky argues that while he left the door open and waved the Defendants into his home, he did not consent voluntarily to the search.[3]  "To ascertain whether consent is valid, courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority."  *Id.* at 422 (internal quotation marks omitted).  "In this circuit, the test is an objective one—whether the agents had a reasonable basis for believing that there was valid consent to the search."  *United States v. Eggers*, 21 F. Supp. 2d 261, 268–69 (S.D.N.Y. 1998).  The *Eggers* court summarized the factors that courts use to evaluate whether consent is voluntary:

> In applying this test . . . it is appropriate to consider the particularities of the situation that is presented in any given case and the possibly vulnerable subjective state of the person who consents.  Other relevant factors are whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent.

*Id.* (footnotes and citations omitted) (finding that consent was not voluntary where the defendant was "very agitated and upset, a fact which was readily apparent to the agents," and the initial attempt to get consent was met with "unequivocal refusal").  "[K]nowledge of the right to refuse

---

[3] While there seems to be no dispute that this constitutes implied consent, I note that I agree that Kaminsky's actions clearly indicated to the officers that they could follow him into the home. *See Seifert v. Rivera*, 933 F. Supp. 2d 307, 316 (D. Conn. 2013) ("[T]he Detectives had a reasonable basis to interpret [the consent giver's] conduct of stepping back allowing room for them to enter, shutting the door after they entered and asking them to sit in the living room until her mother arrived home as an invitation to enter and remain at the home absent any vocal or other indication to the contrary.").  The only issue, then, is whether the consent was coerced.

consent is not a requirement to a finding of voluntariness." *Garcia*, 56 F.3d at 422. "Consent to a search has been found despite formal arrest," *id.* (*citing United States v. Watson,* 423 U.S. 411, 424), but "courts have found threats to one's home [including threats to engage in destructive searches absent consent] . . . render involuntary individuals' consent to search their premises." *United States v. Turner*, 23 F. Supp. 3d 290, 309 (S.D.N.Y. 2014) (collecting cases).

Here, it is undisputed that Kaminsky opened the door, held the door open, and waved Solenski into his home. While Kaminsky argues that he felt he had no choice but to allow the officers into his home, he points to no facts suggesting that his consent was coerced. *See Handy v. City of New Rochelle*, 198 F. Supp. 3d 298, 311 (S.D.N.Y. 2016) ("Defendants did not engage in any action that would imply duress or coercion, and, accordingly, Plaintiff's alleged fear [that her failure to cooperate would be held against her] does not undermine the fact that her consent was given voluntarily."). While courts have declined to grant summary judgment in cases where the parties told two different versions of the events that led to the consent, that is not the case here. *See Doutel v. City of Norwalk*, 2013 WL 3353977, at *13 (D. Conn. July 3, 2013) ("[A] grant of qualified immunity is inappropriate at this stage because the parties' vague and conflicting accounts of what transpired prior to the officers' entry into the . . . household leave genuine issues of material fact which a jury must resolve.").

The parties agree on all of the facts that led to Kaminsky's allowing the Defendants into his home, except that Kaminsky argues that he thought the officers would force their way in if he did not allow them to enter. The officers approached the house in the daytime (ECF No. 57-10 at 23), to speak with an adult male who owned the property in question, who was not under arrest, and who actually knew and recognized one of the officers. Only three officers approached the front door, and there is no evidence that they made threats or raised their voices. Kaminsky did

testify in his deposition that the officers "pounded on the side of the house like they hit it with a butt of a rifle or with their billy club" before he opened the door and described a scene in which "three, four, five, six policeman" were surrounding his house in the yard with their hands on their holsters, but he does not allege that any force was used to gain entry to his home.  (ECF No. 57-10 at 5, 28.)  The record also shows that none of the officers had their weapons drawn, and no one pointed a gun at him.  The pounding on the wall prior to Kaminsky's opening the door and speaking with Solenski and the number of officers (most of whom were not present at the door) constitute the only evidence of a show of force, and that is simply not enough under all the circumstances to render his consent involuntary.  Courts in this Circuit have repeatedly held that being confronted by numerous officers does not render consent involuntary, even in circumstances amounting to a significantly greater show of force than the record shows here. *See Garcia* 56 F.3d at 423 ("Nor does the presence of three law enforcement officers lend significant support to a claim of coercion."); *United States v. Pecoraro*, 991 F. Supp. 146, 148–49 (W.D.N.Y. 1997) (finding consent was voluntarily given even though "the defendant was in a small room, had just been woken up and was surrounded by police agents," such that the room was "very crowded"); *United States v. Lavan*, 10 F. Supp. 2d 377, 384–85 (S.D.N.Y. 1998) (finding voluntary consent after the police surrounded and forced entry into the defendant's apartment after a six hour standoff and then asked her to sign a consent form); *United States v. Murphy*, 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998) ("[Defendant's] consent unquestionably was valid. Although he was in custody and had been handcuffed prior to signing the consent form, there was no show of force except to the extent that the presence of as many as eight officers in the apartment might be so regarded."); *see also United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) (reversing order granting motion to suppress and remanding for determination of

voluntariness of consent to search, even where six officers came to the home, arrested the defendant late at night, denied him access to his attorney, conducted a security sweep with guns drawn, and told him they would not leave until they got a search warrant); *United States v. Guzman*, 724 F. Supp. 2d 434, 441–42 (S.D.N.Y. 2010) (finding that the consent was involuntary where the two of the apartment residents were undocumented aliens subject to deportation, "[s]even law enforcement officers, at least one with a firearm visible, were in the small apartment along with three adults and two children" and "[u]pon their initial entry . . . fanned out and swept the premises without consent," and one of the officers threatened to "arrest and charge all of the apartment's occupants if [the defendant] did not consent to a search of the premises"). The Second Circuit has found voluntary consent even after a "heavily armed SWAT team" forcibly entered the apartment and secured the residents in handcuffs, though the consent was given after "(1) the SWAT team left the premises, (2) [another resident] was arrested and removed from the apartment, (3) [the consent giver] was allowed to call her sister to come help with her daughter, and (4) the remaining officers explained the circumstances to her so that she felt they were treating her 'with respect.'" *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

Kaminsky also argues in his opposition brief that he was not a convicted felon, but was instead convicted of a misdemeanor, and thus that he was allowed to possess the firearms.[4] This argument does not invalidate the consent he gave to the officers to enter his home. If Kaminsky is arguing that the Defendants did not have probable cause to enter his home, "[t]he existence of probable cause is irrelevant to searches or seizures based on consent." *United States v. O'Brien*,

---

[4] In his complaint, Kaminsky does not make this claim. He refers to the conviction as a "State of Connecticut felony conviction" throughout the complaint. (*See* ECF No. 35 at ¶¶ 3, 4, 8.)

498 F. Supp. 2d 520, 536 (N.D.N.Y. 2007), *aff'd*, 303 F. App'x 948 (2d Cir. 2008).  If he is arguing that the consent he gave was involuntary because it was based on incorrect information, that argument also fails.  Courts have invalidated consent based on deceit, but there is no evidence in the record, and no suggestion by the parties, that the Defendants lied to Kaminsky about his felony conviction.  *See United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 291 (S.D.N.Y. 2008) (finding consent involuntary where police officers lied to a defendant and claimed to be searching for a missing girl to gain access to his home); *United States v. Giraldo*, 743 F. Supp. 152, 154 (E.D.N.Y. 1990) (finding consent involuntary where police officers lied to a defendant and claimed there was a possible gas leak to gain access to his home).  At worst, the Defendants made a mistake about the nature of Kaminsky's 1964 conviction, one that Kaminsky's lawyers apparently also made:  Kaminsky's complaint alleges repeatedly that the 1964 conviction was a "felony conviction," and that he went to the trouble of securing a pardon for that conviction in 2013, apparently so he would be able lawfully to possess firearms.  (Am. Compl., ECF No. 35, ¶¶ 3, 4, 6-9.)  Kaminsky argues in his brief that the Coventry Defendants "knew or should have known that unemployment fraud, General Statute § 31-273, was not a felony in 1964," and that it became a felony in 1978 when the legislature increased the penalties. (ECF No. 65 at 2-3.)  But Kaminsky points to no evidence suggesting that the Coventry Defendants knew that the conviction of which they were informed by the State Police on December 16, 2011, was not a felony; indeed, he points to no evidence that the Coventry Defendants knew what the offense of conviction was.  In his Local Rule 56(a)(2) Statement, Kaminsky admits that one of the State Police officers "informed members of the Coventry Police Department that the Plaintiff was a convicted felon and had firearms and machine guns in his possession."  (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 4; Pl.'s L. R. 56(a)(2) Stmt., ECF

No. 65 at ¶ 4.)  The Defendants' apparent mistake as to the nature of the 1964 conviction does not render the consent involuntary. *See United States v. Jelks*, 273 F. Supp. 2d 280, 291 (W.D.N.Y.), *aff'd*, 73 F. App'x 486 (2d Cir. 2003) (finding voluntary consent where a police officer incorrectly told the plaintiff that "parole officers could search a parolee's residence any time [they] felt that there was a need to do so"); *Stone v. Town of Westport*, 411 F. Supp. 2d 77, 83 n.9 (D. Conn. 2006) (finding voluntary consent where a police officer "falsely led [the plaintiff] to believe he was bringing her son home," and noting that "the Court's research has not found[] any authority for the proposition that misrepresentations or confusion concerning the purpose of the entry renders consent to entry involuntary") (internal quotation marks and alterations omitted). [5]

Overall, the record discloses a calm scene, in which Solenski and two Connecticut State Police Officers approached the house, Kaminsky recognized Solenski and asked him what was going on, and he almost immediately allowed them in to discuss what was happening. *See United States v. Schaefer*, 859 F. Supp. 2d 397, 407–08 (E.D.N.Y. 2012), *aff'd*, 519 F. App'x 71 (2d Cir. 2013) (finding voluntary consent where "(1) the defendant was approached at his own residence during the early evening; (2) the two agents and detective who came to his home to speak with him were in plain clothes, and their weapons were not drawn; (3) the agents asked the defendant for permission to enter his home, which he granted; (4) the agents introduced

---

[5] Also, even if a mistake as to the nature of the conviction did render Kaminsky's consent involuntary, the Coventry Defendants would have qualified immunity.  Qualified immunity "shields government officials from liability when they make reasonable mistakes about the legality of their actions, and applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012) cert. denied, 133 S. Ct. 2777 (2013).  Especially given that Kaminsky's own lawyers apparently made the same mistake about the nature of a 1964 conviction, the Coventry Defendants' belief that Kaminsky had a felony conviction was not unreasonable.

themselves and stated that the reason for the visit related to child pornography; (5) the defendant was never handcuffed or placed in custody by the agents; (6) the entire interview and search took one-half hour; and (7) no threats or promises were made to the defendant during the interview or search."). It is undisputed that Kaminsky did not tell Solenski that he could not enter his home. Further, there is no evidence in the record that Kaminsky ever asked Solenski or any other officers to leave the home. In fact, Kaminsky asked Mattson to call his attorney, which she did, and the attorney informed her that Kaminsky would cooperate. Because he has not pointed to any show of force or other conduct by the officers that would provide a reasonable basis for his belief that the officers would forcibly enter without his consent, and because there is no evidence that he conveyed his private thoughts to the officers, he has failed to raise a genuine issue of material fact. Under the circumstances, Kaminsky voluntarily consented to the officers entering the home.[6]

### B.  Entry Into Kaminsky's Yard

As noted above, Kaminsky's complaint alleges that the Defendants "unlawfully entered the real property of the Plaintiff on December 16, 2011," an allegation that embraces both his home and his yard. (ECF No. 35 at ¶ 113.) The Coventry Defendants did not address the Fourth Amendment claim with respect to the entry into Kaminsky's yard in their summary judgment briefs. Nor has Kaminsky addressed this issue in his memorandum in opposition to summary judgment. Nonetheless, because the Coventry Defendants' motion purports to seek summary

---

[6] Although I have found no Fourth Amendment violation, I note that, even if there was a violation, it was objectively reasonable for Solenski and Dexter to believe, under all the circumstances, that Kaminsky voluntarily consented to the entry. The record includes no evidence that Kaminsky gave them any indication that he felt coerced or that he was anything but willing to cooperate, as his attorney indicated in a phone call shortly after the entry. Thus, even if the entry violated his Fourth Amendment rights, Solenski and Dexter would have qualified immunity.

judgment as to the entire Fourth Amendment claim, I will address this issue.  Defendants Flanagan, Dexter, and Opdenbrouw state in their affidavits that they were in Kaminsky's yard on December 16, 2011.  (ECF No. 57-7 at ¶ 4; ECF No. 57-9 at ¶ 4; ECF No. 57-8 at ¶ 5.)  They do not assert that they were on a residential driveway or sidewalk.

The Supreme Court classifies "the area immediately surrounding and associated with the home—what our cases call the curtilage—as part of the home itself for Fourth Amendment purposes."  *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013).  Thus, because "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home," they would need the same to make a lawful entry onto the curtilage of a home.  *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014), *as amended* (Nov. 24, 2014).  To determine if the property in question is curtilage, courts look at four factors:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 240 (*citing United States v. Dunn,* 480 U.S. 294, 300 (1987)).  Here, there is very little evidence in the record about Kaminsky's yard, but it is undisputed that Defendants Flanagan, Dexter, and Opdenbrouw were in it.  The Coventry Defendants have presented no evidence that Kaminsky's yard does not constitute the curtilage of the house, and Kaminsky's testimony suggests that the yard was surrounded by a "stone wall" and a "fence . . . of fir trees."  (ECF No. 57-10 at 21, 24.)  There is nothing in the record to suggest that Flanagan, Dexter, and Opdenbrouw were on the residential walkway or driveway, which would exempt them from the warrant requirement.  *See United States v. Reyes*, 283 F.3d 446, 465 (2d Cir. 2002) ("The route which any visitor to a residence would use is not private in the Fourth Amendment sense, when police take that route for the purpose of making a general inquiry or for some other legitimate

reason."); *United States v. Reilly,* 76 F.3d 1271, 1279 (2d Cir.1996) ("[D]riveways that are readily accessible to visitors are not entitled to the same degree of Fourth Amendment protection as are the interiors of defendants' houses."). Because Kaminsky has included this claim in his complaint and because the Coventry Defendants have failed to show there is no genuine issue of material fact with regard to the entry into the yard, I deny summary judgment to Flanagan, Dexter, and Opdenbrouw with respect to this portion of the Fourth Amendment claim.

### C. The Seizure of Kaminsky's Firearms

The parties agree that Solenski, Flanagan, and Opdenbrouw were not involved in the seizure of Kaminsky's firearms. "Where damages are sought in a section 1983 action, the defendant must be responsible for the alleged constitutional deprivation." *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989). "Since liability cannot attach under the doctrine of *respondeat superior,* we must look instead to the extent of [Defendant]'s involvement in the unconstitutional conduct alleged." *Id.* Because Solenski, Flanagan, and Opdenbrouw were not involved in the seizure of the firearms, that portion of the Fourth Amendment claim against them is DISMISSED.

Defendant Dexter admits in his affidavit that he "assisted in carrying firearms that had already been placed on furniture out to police vehicles which were parked outside." (ECF No. 57-9 at ¶ 8.) The parties agree that after Mattson informed Kaminsky that he was a convicted felon, Kaminsky believed that it was illegal for him to possess the firearms and so he agreed to let the officers remove his firearms from his home. (Def.'s L. R. 56(a)(1) Stmt., ECF No. 57-2 at ¶ 19, 28-29; Pl.'s L. R. 56(a)(2) Stmt., ECF No. 65 at ¶ 19, 28-29.) Kaminsky thus consented to the seizure. And for the same reasons that the consent to entry into Kaminsky's home was voluntary, I find that Kaminsky's consent to the seizure was also voluntary.

### D.  Defendant Hicks

Kaminsky concedes that Defendant Hicks was not at Kaminsky's property at all on December 16, 2011.  Therefore, Defendant Hicks's Motion for Summary Judgment is GRANTED.

### E.  Connecticut Constitution

Kaminsky concedes that his claim against the Coventry Defendants does not rise to the level of egregiousness required for a claim pursuant to Connecticut Constitution, Art. 1, § 7.  Thus, Defendants' Motion for Summary Judgment as to that claim is GRANTED.

### F.  Remaining Issues Briefed by the Parties

#### 1.  Qualified Immunity

The Coventry Defendants argue that they are entitled to qualified immunity.  The doctrine of qualified immunity shields "government officials performing discretionary functions" from civil damages liability as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In addition, if it was "objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity."  *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012) cert. denied, 133 S. Ct. 2777 (2013).  The qualified immunity doctrine protects "all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

I have already found that the Coventry Defendants did not violate Kaminsky's constitutional rights in entering his house and seizing the firearms.  As for the remaining claim regarding entry into his yard, it was clearly established in 2011 that an individual has a

reasonable expectation of privacy in the screened or fenced areas around his house, i.e., curtilage. As discussed, the Coventry Defendants have failed to address this issue, and there is some evidence in the record suggesting that Flanagan, Dexter, and Opdenbrouw did enter onto curtilage. Therefore, they do not have qualified immunity as to this portion of Kaminsky's Fourth Amendment claim.

### 2. Probable Cause

The Coventry Defendants devote most of their briefs to arguing that they have qualified immunity because they were entitled to rely on the information from the Connecticut State Police that Kaminsky was a convicted felon in possession of firearms and thus had probable cause. It is true that the Coventry Defendants would be entitled to qualified immunity if they relied on the information of another agency in concluding that there was probable cause. *See Moore v. Vega*, 371 F.3d 110, 117 (2d Cir. 2004) ("[Q]ualified immunity protects that officer unless his performance was in violation of clearly established law, *or* was plainly incompetent. It was not plainly incompetent for defendants to rely on information provided by a federal law enforcement agency that [the officer] later confirmed with the agent who provided it."). But probable cause, or the lack thereof, is not an issue in this case. There is no "probable cause" exception to the warrant requirement for entering a home or the surrounding curtilage, and so it does not matter whether the Coventry Defendants had probable cause to believe that Kaminsky was a felon in possession of firearms. Further, a showing of consent obviates the need to show probable cause. *See Schneckloth*, 412 U.S. at 219 ("It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). Thus, while the Coventry Defendants have shown they had probable cause, that showing is beside the point here.

### 3. Excessive Force

Finally, while the parties debate in their briefs whether the force used by the Defendants in approaching Kaminsky's home was excessive, the complaint makes no claim that the Defendants used excessive force.  Even if it did, the Defendants would be entitled to summary judgment, because there is no evidence in the record of physical contact, guns drawn by the police, or physical injury to Kaminsky.  *See Marceline v. Delgado*, 2011 WL 2531081, at *8 (D. Conn. June 23, 2011) ("[C]ourts within the Second Circuit have been reluctant to find an excessive force claim where there is no physical contact present. However, other circuits have recognized excessive-force claims in the absence of physical contact, particularly in cases where, as here, there were allegations that officers unreasonably drew their firearms." (internal citation omitted)); *Easton v. City of New York*, 2009 WL 1767725, at *4 n. 5 (E.D.N.Y. June 23, 2009) (while "other circuits have occasionally recognized excessive force claims even where no physical contact occurred, such as where officers pointed guns at an arrestee....[,] [t]he Second Circuit has never before recognized such a claim.").  The lack of clarity in the law as to whether an excessive force claim lies in the absence of physical contact alone means that the defendants would be entitled to qualified immunity on any excessive force claim.

## IV.    Conclusion

For the reasons stated above, the Coventry Defendants' Motion for Summary Judgment (ECF No. 57) is GRANTED in part and DENIED in part.  The motion for leave to file sur-reply is DENIED.  (ECF No. 67.)  The claim against the Defendants Solenski and Dexter for unlawful entry into Kaminsky's home, the claims against all of the Coventry Defendants for unlawful seizure of Kaminsky's firearms, any claim against the Defendants for excessive force, all claims asserted against Defendant Hicks, and the claim for a violation of the Connecticut Constitution

are DISMISSED.  The only remaining claims are against Defendants Flanagan, Dexter, and

Opdenbrouw for unlawful entry onto any curtilage portion of Kaminsky's property, and the

Fourth Amendment claim against Connecticut State Police Officers Barbara Mattson, Vincent

Imbimbo, and Sean Musial, who have not sought summary judgment.


IT IS SO ORDERED.


                                          _____/s/_____
                                          Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              March 20, 2017