# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH W. KAMINSKY, JR., <br>     Plaintiff, <br><br> v. <br><br> BARBARA MATTSON, individually, et al. <br>     Defendants. | No. 3:14-cv-01885 (MPS) |

**RULING ON SUBSEQUENT MOTIONS FOR SUMMARY JUDGMENT**

I earlier granted summary judgment in favor of Town of Coventry police officers who entered the home of Joseph Kaminsky Jr. and seized firearms on December 16, 2011, because I found that Kaminsky had consented to the entry and seizure. *Kaminsky v. Schriro*, 243 F. Supp.3d 221 (D. Conn. 2017). In the same ruling, I denied summary judgment as to the Coventry police officers who remained in Kaminsky's yard during the December 16, 2011, visit, noting that there was a question about whether those officers had invaded the "curtilage" of Kaminsky's property, an issue the parties had not addressed. *Id.* at 231. I later permitted those officers to move for summary judgment as to the curtilage issue, and now conclude, after construing the evidence in the record in the light most favorable to Kaminsky, that the portion of Kaminsky's yard in which those officers were located does not constitute "curtilage" and thus that those officers did not violate his Fourth Amendment rights either. I therefore GRANT the remaining Coventry defendants' motion for summary judgment. (ECF No. 87.) I also allowed the State of Connecticut officers who had entered Kaminsky's home together with the Coventry officers to move for summary judgment, even though they had not done so initially, and now grant their motion as well

(ECF No. 82), because I find that Kaminsky's consent to the entry and seizure extended to the state officers as well.

**I.    Background**

   A.  Procedural History

Kaminsky filed this lawsuit under 42 U.S.C. § 1983 on December 16, 2014, against Dora B. Schriro, Commissioner of the Connecticut Department of Emergency Services and Public Protection (DESPP); DESPP Sergeant Paolo D'Alessandro; Chief of the Coventry Police Department (CPD) Mark A. Palmer[1]; CPD Lieutenants Walter Solenski and Brian Flanagan and CPD Officers Michael Hicks, Robert Dexter, and Ted Opdenbrouw; and Connecticut State Police (CSP) Officers Barbara Mattson, Vincent Imbimbo, and Sean Musial. (ECF No. 1.) He then amended his complaint on September 2, 2015. (ECF No. 35.)

On June 21, 2016, I granted in part and denied in part the defendants' motion to dismiss the amended complaint. (ECF No. 63.) I dismissed the claims against the State of Connecticut Defendants in their official capacities, the portion of Count Two asserting a Second Amendment violation, the portion of Count Three asserting a First Amendment violation, and the supervisory claim against Defendant D'Alessandro; and dismissed without prejudice the remaining portions of Counts Two (asserting a violation of Article First, Section 15 of the Connecticut Constitution) and Three (asserting a violation of Article First, Section 10 of the Connecticut Constitution). I also dismissed the claims against Solenski and Flanagan in their official capacities.

On March 20, 2017, as noted, I granted in part and denied in part the motion for summary judgment by defendants Solenski, Flanagan, Dexter, Opdenbrouw, and Hicks of the CPD (the Coventry Defendants). I granted summary judgment on all claims against them, except for

---

[1] The Court granted Defendant Palmer's motion to dismiss on June 16, 2015. He is no longer a defendant in the case. (ECF No. 32.)

Kaminsky's claim against Flanagan, Dexter, and Opdenbrouw for unlawful entry onto any curtilage portion of Kaminsky's property. The Coventry officers have now submitted a second motion for summary judgment (with my permission), and that motion is fully briefed. Connecticut State Police Officers Barbara Mattson, Vincent Imbimbo, and Sean Musial (the Connecticut Defendants) did not seek summary judgment initially but now have filed a motion for summary judgment on the remaining claims against them, and that motion is fully briefed as well.

B. Facts[2]

  1. *Kaminsky's Property*

Joseph Kaminsky is 86 years old and lives at 105 John Hand Drive in Coventry, Connecticut. (ECF Nos. 87-2 at ¶ 1, 97-1 at ¶ 1.) The south and east borders of his property abut Wangumbaug Lake for 105 feet. (ECF Nos. 83 at ¶ 3, 95 at ¶ 3.) This means that one side of his house and a yard face the lake: there is no fence or enclosure to block either his yard or his home from full view by any boats on the lake, other than a low stone retaining wall. (ECF Nos. 83 at ¶ 4, 95 at ¶ 4.) Kaminsky's property lies within a cove of the lake, but there is no fence, blockade, or other restriction separating this cove from access to the lake as a whole. (ECF Nos. 95 at ¶ 4, 94-11, 94-14.) Wangumbaug Lake has a public boat launch, and the general public is permitted to use it to access the lake. (ECF Nos. 83 at ¶ 5, 95 at ¶ 5.) Any member of the public on the lake would be able to view Kaminsky's property and house unobstructed: although it is removed from the main part of the lake, there is nothing preventing the public from accessing the cove. (ECF Nos. 83 at ¶ 6, 95 at ¶ 6, 94-11.) The yard area around the low stone retaining wall is fully visible

---

[2] The facts are taken from the Connecticut Defendants' Local Rule 56(a)(1) Statement (ECF No. 83), the Coventry Defendants' Local Rule 56(a)(1) Statement (ECF. No. 87-2), and Kaminsky's Local Rule 56(a)(2) Statements (ECF Nos. 95 and 97-1). Additional facts in the record are referenced as necessary. The facts are undisputed unless otherwise indicated.

3

from the lake, and there is a clear view of several houses on the other side of the lake from the area in Kaminsky's yard near the stone wall. (*Id.*)

Also in that yard area near the low stone wall is a flagpole. (ECF No. 87-7, 94-11.) The pole towers above Kaminsky's house, reaching approximately twice its height. (ECF No. 87-7.) In the photograph submitted by the defendants, it appears that there are two large flags hanging from the flagpole. (ECF No. 87-7.) In the video submitted by the plaintiff, the camera pans up to show a large American flag hanging from it as well. (ECF No. 94-11.) The flagpole faces out to the lake. (ECF No. 87-7.) Its flags are visible from the lake and from the houses across the lake that face Kaminsky's property. (ECF No. 94-11.)

Trees border Kaminsky's property on the north and west sides. (ECF Nos. 94-11, 94-14.) While the trees on the west side of the property are thick and obscure the view of Kaminsky's house (except for the area near the driveway, from which the house is visible), the trees on the north side are both sparse and spare. (*Id.*) The few trees that are there are small and do not block a view of Kaminsky's house. (*Id.*) Kaminsky's northerly neighbor's house sits just a few yards away, with a full view of Kaminsky's property through this line of trees. (*Id.*) Kaminsky's front door, visible from the road, is sealed shut: a path leads along the northern border of the property around the back of the house to another door, which faces the lake. (*Id.*)

   2. *December 16, 2011*

On December 16, 2011, Connecticut State Police (CSP) Officer Barbara Mattson received a call from FBI Agent Eric Moore about Joseph Kaminsky's recent application to renew his federal firearms permit. (ECF Nos. 87-2 at ¶ 9, 97-1 at ¶ 9.) Agent Moore informed Mattson that the records check conducted for the renewal revealed that Kaminsky had a felony conviction from 1964. (*Id.*) Agent Moore stated that Kaminsky's application to renew his permit was denied for

4

that reason. (*Id.*) Conn. Gen. Stat. § 53a-217 prohibits people previously convicted of felonies from possessing firearms.

After receiving this information, Mattson queried Kaminsky's criminal history through the State Police Bureau of Identification (SPBI) database. (ECF Nos. 87-2 at ¶ 10, 97-1 at ¶ 10.) Kaminsky was listed in that database as having a 1964 conviction for seven counts of unemployment insurance fraud. (*Id.*) She also checked the Special Licensing and Firearms Unit (SLFU) databases and learned that Kaminsky held a current Connecticut permit to carry pistols and revolvers and a Town of Coventry permit to sell firearms—neither of which a felon lawfully may possess. (ECF Nos. 87-2 at ¶ 11, 97-1 at ¶ 11.) Mattson noticed that the 1964 conviction was not listed in the SPBI database the last time Kaminsky's Connecticut pistol permit was renewed, which was on August 17, 2010. (ECF Nos. 87-2 at ¶ 12, 97-1 at ¶ 12.) Mattson further learned that Kaminsky had six firearms registered to his name, including three machine guns, in violation of both state and federal law. (ECF No. 87-2 at ¶ 13, 97-1 at ¶ 13.) Mattson compared the fingerprints for Kaminsky's 1964 conviction with the fingerprints for the pistol permit registered to his name, and they matched. (ECF Nos. 87-2 at ¶ 14, 97-1 at ¶ 14.)

Mattson and Vincent Imbimbo, another SLFU detective, then drove to the CPD to speak with Mark Palmer, Chief of Police. (ECF Nos. 87-2 at ¶ 15, 97-1 at ¶ 15.) At the CPD, Mattson and Imbimbo spoke with Chief Palmer, Lieutenant Walter Solenski, and Detective Matthew Hicks and alerted them that Kaminsky had a prior felony conviction and had registered firearms in his possession. (ECF Nos. 87-2 at ¶ 16, 97-1 at ¶ 16.) Mattson and Imbimbo told the CPD officers that they intended to provide Kaminsky with written notification that his permit was being revoked because of his criminal conviction and that they intended to speak with Kaminsky about the surrender of the firearms in his possession. (*Id.*) Solenski stated that he was acquainted with

Kaminsky and would accompany Mattson and Imbimbo to Kaminsky's house. (ECF Nos. 87-2 at ¶ 17, 97-1 at ¶ 17.) Solenski, as well as CPD Sergeant Brian Flanagan and CPD Officers Dexter and Opdenbrouw, then accompanied Mattson and Connecticut State Police officers to Kaminsky's home on December 16, 2011. (ECF Nos. 57-2 at ¶ 5, 65 at ¶ 5, 87-2 at ¶ 18, 97-2 at ¶ 18.)

When they arrived at Kaminsky's home, at approximately 10:51 a.m., Mattson parked in the driveway. (ECF No. 97-1 at 21, ¶ 18.) The Coventry defendants were in another car. (ECF No. 97-1 at 21, ¶ 17.) The officers "had to walk up a little bit and come around" to reach the door, i.e., the door facing the lake. (ECF No. 97-1 at 21, ¶ 19.) According to Kaminsky, as the police approached his home, they "pounded on the side of the house like they hit it with a butt of a rifle or with their billy club." (ECF No. 82-12 at 5.)[3] Mattson, Imbimbo, and Solenski approached the door. (ECF No. 97-1 at ¶¶ 17–19.) Kaminsky went to the door, and "Soleknski was standing at the bottom of the steps, the entryway to the door." (ECF No. 82-12 at 5.) Kaminsky recognized Solenski and asked him "What is going on, Walt?", and Solenski said "Can we come in?" (ECF Nos. 82-12 at 5, 87-2 at ¶ 19, 97-1 at ¶ 19.) Kaminsky then waved the officers inside. (ECF No. 82-12 at 5) ("So, they—I left the door open and I waved them in.")

Flanagan, Dexter, and Opdenbrouw stayed outside. Kaminsky stated that he observed "three, or four, or five" officers on his property that day. (ECF No. 95 at 6, ¶ 11.) He states that they were "close to and on the house side of his stone [retaining] wall." (ECF No. 95 at 6, ¶ 12; *see also* ECF No. 94-13 at 2 ("[C]lose to my stone wall so they could jump over the stone wall it looked like to me. Take protection from a felon like myself.")) In the affidavits accompanying the

---

[3] None of the parties suggest that there were any exigent circumstances surrounding the defendants' entry into Kaminsky's yard or home. Although they knew that Kaminsky was in possession of multiple firearms, Mattson testified that the purpose of their visit was to inform Kaminsky about the conviction issue and discuss surrender of the firearms. (ECF No. 82-3 at 51.) The Connecticut officers discussed coming back to see Kaminsky another day if they could not make contact. (*Id.* at 68.)

6

Coventry defendants' first motion for summary judgment, Flanagan, Dexter, and Opdenbrouw all stated that they waited in Kaminsky's yard, while Mattson, Imbimbo, and Solenski went inside. (ECF Nos. 57-7 at ¶ 5 and 57-9 at ¶ 5.) They stated that this was to provide "cover" for the officers who went inside, given that they knew Kaminsky was in possession of several firearms and had a previous conviction. (*Id.*) In Flanagan's and Dexter's affidavits accompanying this second motion for summary judgment, however, they state that they were outside the bounds of Kaminsky's property, "near the house of Joseph Kaminsky." (ECF Nos. 87-4 at ¶¶ 4, 6, 87-9 at ¶¶ 4, 6.) Opdenbrouw states that he was in fact in Kaminsky's yard while he was providing cover for the other officers. (ECF No. 87-11 at ¶ 4.) Once Solenski, Mattson, and Imbimbo entered Kaminsky's house, these three officers left their positions and returned to stand on the public road. (ECF Nos. 87-4 at ¶ 18, 87-9 at ¶ 13, 87-11 at ¶ 9.)

Once inside, Mattson informed Kaminsky that she believed Kaminsky had been convicted of a felony and, therefore, could not possess firearms legally. (ECF No. 87-2 at ¶ 20, 97-1 at 8, ¶ 20.) Kaminsky explained to Mattson that his attorney was working on that issue with the federal firearms authorities. (*Id.*) Kaminsky requested that Mattson telephone his attorney and handed her his attorney's business card. (*Id.*) Mattson called Kaminsky's attorney, Donald Weisman, from the kitchen and explained that she believed Kaminsky was unable to possess firearms because of his felony conviction. (ECF No. 87-2 at ¶ 22, 97-1 at 8, ¶ 22.) Weisman stated that Kaminsky would cooperate in surrendering firearms to the officers. (*Id.*)[4]

---

[4] Kaminsky now disputes that it was illegal for him to possess firearms, contending that the offense for which he was convicted—unemployment fraud—was not a felony in 1964. But he does not dispute that he agreed to turn over his firearms. (*See* ECF No. 87-2 at ¶ 22, 97-1 at 8, ¶ 22.); *see also Kaminsky v. Schriro*, 243 F. Supp.3d 221, 230–231 (D. Conn. 2017) (further discussing this issue and holding that any mistake on the part of the defendants about whether Kaminsky's conviction prevented him from possessing firearms did "not render [his] consent involuntary").

7

After Mattson spoke with his attorney, Kaminsky agreed to turn over his firearms. (ECF Nos. 87-2, 97-1 at ¶ 23.) Kaminsky surrendered his pistol permit and "went around his residence removing firearms from their places of storage." (ECF Nos. 87-2 at ¶ 24, 97-1 at ¶ 24.) This included removing firearms stored in the attic by accessing a concealed folding staircase. (ECF Nos. 87-2 at ¶ 25, 97-1 at ¶ 25.) The officers accepted Kaminsky's surrender of 36 firearms that day, according to the inventory report. (ECF Nos. 87-2 at ¶ 30, 97-1 at ¶ 30.)[5] Mattson instructed Kaminsky to come to the CPD to sign and receive a copy of paperwork indicating that he had surrendered these firearms. (ECF Nos. 87-2 at ¶ 28, 97-1 at ¶ 28.) Later that day, Kaminsky did so and signed the SLFU Surrendered Firearms Log sheets indicating that he had surrendered 36 firearms. (ECF Nos. 87-2 at ¶ 31, 97-1 at ¶ 31.)

### 3. *December 19, 2011*

On December 19, 2011, Solenski received a telephone call from Attorney Weisman, who stated that Kaminsky had located additional firearms in his house that he wished to surrender. (ECF Nos. 87-2 at ¶ 35, 97-1 at ¶ 35.) Solenski passed this information along to the SLFU. (*Id.*) Mattson then telephoned Weisman to confirm that Kaminsky wanted to surrender additional firearms. (ECF Nos. 87-2 at ¶ 36, 97-1 at ¶ 36.) Mattson informed him that three of the weapons surrendered on December 16, 2011, were illegal assault weapons under Connecticut law and would have to be destroyed. (*Id.*) Weisman asked if Kaminsky would be arrested, and Mattson assured him that Kaminsky would not. (*Id.*) Weisman again affirmed that Kaminsky would cooperate in surrendering the additional firearms. (*Id.*)

---

[5] The parties dispute whether Flanagan, Dexter, or Opdenbrouw assisted with carrying the firearms out of Kaminsky's home and into the police cars. (ECF Nos. 87-2 at ¶ 27, 97-1 at ¶ 27.) But Kaminsky cannot raise this claim now, as I already granted summary judgment as to all Coventry officers regarding the entry into Kaminsky's home and seizure of the firearms, and Kaminsky did not timely seek reconsideration. *See* 243 F. Supp.3d at 231, 233.

8

That afternoon, following the call with Weisman, Mattson and CSP detective Musial drove to Kaminsky's property. (ECF Nos. 87-2 at ¶ 37, 97-1 at ¶ 37.) Mattson and Musial knocked on Kaminsky's door, and he showed them into his home, where he had gathered firearms for surrender on the back porch. (ECF Nos. 87-2 at ¶ 38, 97-1 at ¶ 38.) The detectives loaded the firearms Kaminsky had gathered into their car and drove back to the CPD. (*Id.*) At the CPD, Mattson, Musial, and Hicks documented the receipt of 23 additional firearms from Kaminsky. (ECF Nos. 87-2 at ¶ 39, 97-1 at ¶ 39.) Kaminsky came to the CPD on December 20, 2011, and signed for the surrender of these 23 additional firearms. (ECF Nos. 87-2 at ¶ 42, 97-1 at ¶ 42.) He also signed paperwork, under protest, stating that he was surrendering a Group Industries Uzi sub-machine gun, a SWD M-11 sub-machine gun, and a BWest AK-47 rifle previously turned over to Mattson on December 16. (ECF Nos. 87-2 at ¶ 44, 97-1 at ¶ 44.) Once Kaminsky obtained a pardon for his criminal convictions, 56 of the 59 seized firearms eventually were returned either to Kaminsky or to his grandson for safekeeping. (ECF Nos. 87-2 at ¶¶ 48–49, 97-1 at ¶¶ 48–49.) The remaining 3 firearms were determined to be illegal assault weapons under Connecticut law and were not returned. (ECF Nos. 87-2 at ¶ 50, 97-1 at ¶ 50.)[6]

## II. Standard of Review

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving parties bear the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a

---

[6] Kaminsky also brought a state court case against the Commissioner of the Department of Emergency Services and Public Protection claiming that he was entitled to the return of these 3 firearms and 24 additional firearms that were not inventoried. The Superior Court found that the 3 firearms were lawfully confiscated and that Kaminsky had not produced adequate proof that the other 24 firearms actually existed. (*See* ECF No. 82-14.)

verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (internal citations and alterations omitted).

If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The Court considers all facts "in the light most favorable to the nonmoving party" after drawing "all reasonable inferences in his favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000) (quotation marks omitted).

### III. Discussion

#### A. Curtilage Claim

The parties have now briefed the curtilage issue and have submitted additional evidence. (ECF Nos. 87, 94.) Kaminsky claims that Flanagan, Dexter, and Opdenbrouw violated his Fourth Amendment rights by standing in his yard "close to" the low stone retaining wall without a warrant.[7] But the undisputed facts show that Kaminsky did not have a reasonable expectation of privacy in the location where Flanagan, Dexter, and Opdenbrouw stationed themselves. Therefore,

---

[7] As noted, the Coventry defendants have now submitted evidence that Flanagan and Dexter were not in Kaminsky's yard at all. (ECF No. 87-1 at 4.) But the affidavits that Flanagan and Dexter submitted with their first motion for summary judgment stated that they were "wait[ing] in the yard covering officers who were entering the Kaminsky House" while the other officers entered the house. (ECF Nos. 57-7 at ¶ 5 and 57-9 at ¶ 5.) The Coventry defendants state that Flanagan and Dexter realized that they were not on Kaminsky's property only after the Court issued the first summary judgment ruling and they returned to the property and viewed images of the property in order better to understand their locations on December 16, 2011. (*See id.*) These defendants acknowledge that this is a discrepancy that "may be argued to present a question of fact." (ECF No. 87-1 at 4.) It does not, however, present a question of material fact: viewing the facts in the light most favorable to Kaminsky, I conclude that the area in which Kaminsky claims to have seen the officers was not Fourth Amendment-protected curtilage.

even if all of the officers were in that area of Kaminsky's yard, no Fourth Amendment violation occurred.

The Fourth Amendment protects against "unreasonable searches and seizures." "It "indicates with some precision the places and things encompassed by its protections: persons, houses, papers, and effects." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) And of these places and things, "the home is first among equals." *Id.* "In the home, our cases show, *all* details are intimate details, because the area is held safe from prying government eyes." *Kyllo v. U.S.*, 533 U.S. 27, 37 (2001) (emphasis in original).

"[T]he curtilage of the house," or the area "immediately surrounding [the] house," "enjoys protection as part of the home itself." *Jardines*, 569 U.S. at 5–6. The Fourth Amendment right to "be free from unreasonable governmental intrusion . . . would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Id.* at 7 (internal quotation marks and citations omitted). "While law enforcement officers need not shield their eyes when passing by the home on public thoroughfares, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." *Id.* (internal quotation marks and citations omitted).

The Fourth Amendment's protection of curtilage, however, "d[oes] not extend to the open fields." *U.S. v. Dunn*, 480 U.S. 294, 300 (1987) (citing *Hester v. United States*, 265 U.S. 57, 59 (1924)). "[T]he extent of curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Dunn*, 480 U.S. at 300. The "central component" of the inquiry is "whether the area harbors the intimate

activity associated with the sanctity of a [person's] home and the privacies of life." *Id.* (internal quotation marks and citations omitted). Four factors to consider in this inquiry are:

(1) "the proximity of the area claimed to be curtilage to the home";
(2) "whether the area is included within an enclosure surrounding the home";
(3) "the nature of the uses to which the area is put"; and
(4) "the steps taken by the resident to protect the area from observation by people passing by."

*Id.* at 301. These factors, though, are meant to be "useful analytical tools" rather than "a finely tuned formula that, when mechanically applied, yields a 'correct' answer." *Id.*

While a "useful tool", *Dunn*'s factor analysis for determining curtilage is but "a special case of the more general doctrine that a reasonable expectation of privacy is necessary for a successful Fourth Amendment claim." *U.S. v. Titemore*, 437 F.3d 251, 259 (2d Cir. 2006) (internal quotation marks and alterations omitted) (citing *Tri-State Steel Constr., Inc. v. Occupational Safety & Health Review Comm'n*, 26 F.3d 173, 178 (D.C. Cir. 1994) (Williams, J., concurring in the result)). "The touchstone of our inquiry, therefore, remains whether [the defendant] had a reasonable expectation of privacy in [the area at issue]." *United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir.), *on reh'g*, 91 F.3d 331 (2d Cir. 1996). "[T]he yard of a residential property is not necessarily curtilage and there is no per se rule for what is and what is not curtilage." *Golodner v. City of New London, Conn.*, No. 314-CV-00173-VLB, 2015 WL 1471770, at *6 (D. Conn. Mar. 31, 2015).

Kaminsky did not have a reasonable expectation of privacy in the area in which Flanagan, Dexter, and Opdenbrouw stationed themselves, and so no Fourth Amendment violation occurred. Although there is a factual issue about where precisely the officers were, when the facts are viewed in the light most favorable to Kaminsky, the officers were standing in his yard "close to" the stone wall. (ECF No. 94-3 at 9.) On balance, an analysis of the *Dunn* factors as applied to that area of

Kaminsky's yard shows that Kaminsky did not have a reasonable expectation of privacy in this area.

*(i) Proximity to the home*

Although Kaminsky's yard is not very large, the low stone wall is at the furthest edge from the house and closer to the lake—which is open to public observation—than it is to the house. It is certainly not so close to the house that anyone present there might be able to observe private activities inside the home. Nor is it covered or sheltered by an extension of the home or other structure. Because the area, instead, is open, Kaminsky did not "ensure his seclusion well beyond the [house] area," as is required to find a reasonable expectation of privacy in an area clearly removed from the house itself. *Reilly*, 76 F.3d at 1278.

*(ii) Enclosure*

The yard in which Kaminsky states that Flanagan, Dexter, and Opdenbrouw stood is not surrounded by an enclosure. Kaminsky argues that his property is "bordered by a thick row of fir trees, a row of trees[,] and a lake." (ECF No 94 at 16.) He argues that these natural features form an "enclosure" like the "hedgerows along the east and west sides [of a property] and . . . thick woods on the north side" in *Reilly*, 76 F.3d at 1276, which the Second Circuit held constituted an enclosure, even though they were natural features. But unlike the yard in *Reilly*, the part of Kaminsky's yard in which the officers were standing is not enclosed at all. While there is a thick row of fir trees bordering part of the front of Kaminsky's property (i.e., on the side of the house facing the road), all the other borders on Kaminsky's land are open and permit clear observation from the outside. The trees planted on the north side of the property are widely spaced and small, such that they provide no screen from the view of Kaminsky's north-side neighbor, whose house, with facing windows, looms close to his property line. (ECF No. 94-11.) And, while the lake

13

borders Kaminsky's property on another side, the lake is accessible to the public. (ECF Nos. 83 at ¶ 5, 95 at ¶ 5; 94-14.) Kaminsky argues that his property sits along a protected cove, but that does not establish that it is enclosed on that side either. Although that part of the lake is set off slightly, it is not physically blocked from the rest of the lake. (ECF No. 94-14.) Anyone on a boat might choose to enter the cove, during an excursion on the lake, and the yard itself takes in a full view of a major portion of the lake. (ECF No. 94-11.) Further, the low stone retaining wall neither fully borders Kaminsky's property along the lake shore nor blocks his yard from the view of any member of the public on the lake. (ECF Nos. 83 at ¶ 6, 95 at ¶ 6, 94-11.) Therefore, Kaminsky's property is not "enclosed" from view in the same way that the property in *Reilly* was, and this factor weighs against considering the part of his yard where the officers were curtilage.

*(iii) Use of the yard*

Kaminsky has an outdoor grilling and eating area set up in his backyard, overlooking the lake. These areas are relatively comparable to the "gazebo, cottage, copse, and pond, located as they were in relation to each other and to the main residence, and maintained as they were found by the district court to be," which the Second Circuit determined to be "typically used for private activities." *Reilly*, 76 F.3d at 1279. Kaminsky, though, does not state that the officers were in those areas of his yard. Rather, he says that they were "close to" the low stone retaining wall, which is close to the lake and appears to be designed to protect the yard from any rising water. (*See* ECF No. 94-13 at 2.) This purpose is not the same sort of private activity of the home that the court in *Reilly* considered to be protected by a reasonable expectation of privacy. This factor therefore does not weigh in favor of Kaminsky either.

*(iv) Steps taken to prevent observation*

The final factor weighs most heavily against Kaminsky. Although a thick line of trees borders one edge of his property, the other sides are open to public observation. The Second Circuit previously has determined that areas similarly not hidden from the view of others are not part of constitutionally protected curtilage. In *Simko v. Town of Highlands*, the Second Circuit held that "trees, bushes, and stumps" surrounding the property did not "significantly limit access to or visibility of the [area in question] from neighboring properties." 276 F. App'x 39, 41 (2d Cir. 2008). The Second Circuit found that an analysis of "these factors as a whole" supported the district court's conclusion that "the shed and surrounding area was not within the curtilage of [the plaintiff]'s home and not entitled to a heightened expectation of privacy." *Id.* And in *United States v. Hayes*, the Second Circuit also concluded that there was no reasonable expectation of privacy in an area of the defendant's property where "there was no fence or other structure designed to shield the area in question." 551 F.3d 138, 148–49 (2d Cir. 2008). Although in the context of the special needs exception to the warrant requirement, the Second Circuit also has determined that a plaintiff had "a diminished expectation of privacy" in the "rear areas of the [plaintiff]'s home" that were "freely observable to the public from the water and from the rear deck and yard of at least one of [plaintiff]'s neighbors." *Palmieri v. Lynch*, 392 F.3d 73, 83 (2d Cir. 2004).

Kaminsky argues that his property was not visible from the street. But that is not the full extent of the visibility analysis. The Second Circuit in *Simko* wrote that the police's ability to "access that area with minimal effort[] indicate[d] the relatively open exposure of the area to the neighboring properties, if not the public at large," and it determined that this was one of the factors that meant that the area was not Fourth Amendment protected curtilage.[8] *Id.* In this case, the

---

[8] Kaminsky also argues that the front door—which faces the road—was "literally nailed shut with wood parts around its frame." (ECF No. 94 at 17.) If anything, this undercuts Kaminsky's argument concerning the location of the officers in the backyard. With the front door boarded shut and, as shown on the video, a path leading around the back of the house, a visitor approaching the house would reasonably assume the main entrance to the house was around the back.

15

officers followed the path around Kaminsky's house because the front door was sealed shut, in order to knock. (ECF Nos. 82-3 at 52–53, 94-11, 97-1 at 21, ¶ 18) There was nothing preventing them from doing so. (ECF No. 94-11.) And the trees between Kaminsky's house and his neighbors do not block their view into his yard, and he has taken no steps otherwise to shield it from their view. (*Id.*) This indicates exposure of the property to at least neighboring properties, if not the public at large.

As for the lakeshore, Kaminsky argues that, because his property is in a natural cove of the lake, his property is not visible from that side either. Although Kaminsky's house is in a cove (ECF No. 94-14)—meaning it is less likely to be visible from some parts of the lake—again he has taken no steps to block access to that cove or to prevent anyone on a boat on any part of the lake from viewing his backyard. The cove itself is broad enough to permit observation of, and observation from, a substantial area of the lake located outside the cove. (*See* ECF No. 94-11, 94-14.) Therefore, the area in which Kaminsky said that the officers were standing was visible to the public and to Kaminsky's neighbors, unobstructed by any natural or artificial barriers, and this factor weighs heavily against a finding that Kaminsky had any reasonable expectation of privacy there. *See Palmieri*, 392 F.3d at 83.

Moreover, Kaminsky erected a flagpole—standing twice the height of his home—in his yard, directly facing the lake, near the low stone wall where the officers were stationed. (ECF Nos. 87-7, 94-11.) He hung large flags on the pole: the video of his property shows a sizeable American

---

(ECF No. 94-11.) In fact, Mattson stated that she did assume that the door facing the lake was Kaminsky's front door. (ECF No. 82-3 at 51.) Therefore, having the door facing the road nailed shut reasonably would lessen any expectation of privacy that Kaminsky may have had in his backyard, where there was a workable entrance. *See Florida v. Jardines*, 569 U.S. 1, 8 (2013) (holding that an "implicit [public] license typically permits [a] visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do") (internal quotation marks omitted).

flag displayed on the pole. (ECF No. 94-11.) The position of the pole and the size of the flags suggest that Kaminsky invited public observation of that portion of his yard, the same portion in which the officers were standing. In other words, Kaminsky likely expected others to observe that area of his yard. Thus, Kaminsky not only failed to conceal this area of his yard from view but also took active steps to *attract* observers. This is not what one does with areas of one's home that one wants to keep private.

Considering the four factors together and mindful that the central question remains "whether the area harbors the intimate activity associated with the sanctity of a [person's] home and the privacies of life," *Dunn*, 480 U.S. at 300, I find that the area in which Kaminsky alleges that the defendants were standing does not constitute curtilage. Therefore, Kaminsky did not have a reasonable expectation of privacy in this area, and the Coventry officers did not violate the Fourth Amendment by standing there. I GRANT the Coventry defendants' motion for summary judgment on the curtilage issue.

B. <u>Claims against the Connecticut Defendants</u>

The Connecticut Defendants have now moved for summary judgment on the remaining claims against them: (1) the Fourth Amendment claim and (2) the Connecticut constitutional claim. Kaminsky does not address the Connecticut constitutional claim in his brief opposing the Connecticut defendants' motion for summary judgment. Therefore, that claim is abandoned. *See Packer v. SN Servicing Corp.*, 250 F.R.D. 108, 112 (D. Conn. 2008) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned."). And although the Connecticut defendants briefed issues regarding Kaminsky's claims about the Connecticut defendants' second entry into Kaminsky's home and seizure of firearms on December 19, 2011, Kaminsky did not

address any of those issues in his opposition brief. (*See* ECF No. 97.) Therefore, those claims have been abandoned as well, and I will not address them. *See Packer*, 250 F.R.D. at 112.

Kaminsky does argue that, during the first entry on December 16, 2011, the consent to search his home extended only to Solenski—not the Connecticut defendants—and that the Connecticut defendants used his consent to circumvent a lack of probable cause to search his home. Those arguments are unpersuasive. As I stated in the ruling on the Coventry defendants' first motion for summary judgment, "[t]o ascertain whether consent is valid, courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (internal quotation marks omitted). "In this circuit, the test is an objective one—whether the agents had a reasonable basis for believing that there was valid consent to the search." *United States v. Eggers*, 21 F. Supp. 2d 261, 268–69 (S.D.N.Y. 1998). The *Eggers* court summarized the factors that courts use to evaluate whether consent is voluntary:

> In applying this test . . . it is appropriate to consider the particularities of the situation that is presented in any given case and the possibly vulnerable subjective state of the person who consents. Other relevant factors are whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent.

*Id.* (footnotes and citations omitted) (finding that consent was not voluntary where the defendant was "very agitated and upset, a fact which was readily apparent to the agents," and the initial attempt to get consent was met with "unequivocal refusal"). "[K]nowledge of the right to refuse consent is not a requirement to a finding of voluntariness." *Garcia*, 56 F.3d at 422. "Consent to a search has been found despite formal arrest," *id.* (citing *United States v. Watson,* 423 U.S. 411, 424), but "courts have found threats to one's home [including threats to engage in destructive

18

searches absent consent] . . . render involuntary individuals' consent to search their premises." *United States v. Turner*, 23 F. Supp. 3d 290, 309 (S.D.N.Y. 2014) (collecting cases).

I have already held that Kaminsky voluntarily consented to Solenski's entry into his house, and Kaminsky has presented no evidence that he did not also consent to Mattson's and Imbimbo's entry at the same time. I previously held that Kaminsky's consent was not coerced because:

> Kaminsky did not tell Solenski that he could not enter his home. Further, there is no evidence in the record that Kaminsky ever asked Solenski or any other officers to leave the home. In fact, Kaminsky asked Mattson to call his attorney, which she did, and the attorney informed her that Kaminsky would cooperate. Because he has not pointed to any show of force or other conduct by the officers that would provide a reasonable basis for his belief that the officers would forcibly enter without his consent, and because there is no evidence that he conveyed his private thoughts to the officers, he has failed to raise a genuine issue of material fact. Under the circumstances, Kaminsky voluntarily consented to the officers entering the home.

(ECF No. 73 at 15.) Kaminsky has not presented any evidence to support a finding that he did not consent voluntarily to Mattson and Imbimbo entering at the same time as Solenski. Solenski, Imbimbo, and Mattson approached Kaminsky's door together. (ECF Nos. 83 at ¶ 18, 97-1 at ¶ 18.) Although Kaminsky directly addressed Solenski—saying "What's going on, Walt [Solenski]?" (ECF No. 97-1 at ¶ 18)—he gave no indication, when he waved Solenski in, that his invitation extended only to Solenski. In fact, he "left the door open and . . . waved them in," referring to all three officers. (ECF No. 82-12 at 7.)

Kaminsky also argues that, because the officers who entered his home did not have probable cause to believe he committed a crime, their use of the consent exception to the warrant requirement was improper.[9] He contends that "[i]n using the consent exception as the default method of seizing property rather than a warrant to ensure the orderly and lawful seizure of the

---

[9] Kaminsky also argues that, because there were no exigent circumstances, the officers needed a warrant based on probable cause to enter the house. The parties do not dispute that there were no exigent circumstances. But the officers legally entered the home under another exception to the warrant requirement: the consent exception. Therefore, Kaminsky's argument about the lack of exigent circumstances is misplaced.

property the need to manipulate the circumstances to obtain entry so a seizure will later be found to be consensual becomes a game that the law enforcement officer usually wins." (ECF No. 97 at 12.) However, as I already held with regard to the Coventry defendants:

> If Kaminsky is arguing that the Defendants did not have probable cause to enter his home, "[t]he existence of probable cause is irrelevant to searches or seizures based on consent." *United States v. O'Brien*, 498 F. Supp. 2d 520, 536 (N.D.N.Y. 2007), *aff'd*, 303 F. App'x 948 (2d Cir. 2008). If he is arguing that the consent he gave was involuntary because it was based on incorrect information, that argument also fails. Courts have invalidated consent based on deceit, but there is no evidence in the record, and no suggestion by the parties, that the Defendants lied to Kaminsky about his felony conviction. *See United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 291 (S.D.N.Y. 2008) (finding consent involuntary where police officers lied to a defendant and claimed to be searching for a missing girl to gain access to his home); *United States v. Giraldo*, 743 F. Supp. 152, 154 (E.D.N.Y. 1990) (finding consent involuntary where police officers lied to a defendant and claimed there was a possible gas leak to gain access to his home). At worst, the Defendants made a mistake about the nature of Kaminsky's 1964 conviction, one that Kaminsky's lawyers apparently also made[.]

(ECF No. 73 at 12.) Kaminsky has presented no evidence that these circumstances were different for the Connecticut defendants than they were for the Coventry defendants. Therefore, I find that Kaminsky voluntarily consented to the Connecticut officers' entry into his home, and no Fourth Amendment violation occurred during the officers' visit to Kaminsky's home on December 16, 2011.

## IV. Conclusion

For the reasons stated above, I **GRANT** the Coventry defendants' motion for summary judgment on the Fourth Amendment curtilage issue, and I **GRANT** the Connecticut defendants' motion for summary judgment on all claims against them. The Clerk is directed to close this case.

/s/
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           January 12, 2018